UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| THE PRESERVE AT METROCENTER GP, LLC, a Tennessee limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANT CREDIT FACILITY, LTD., a Florida limited partnership; ALLIANT CREDIT FACILITY ALP, LLC, a Florida limited liability company,<br><br>Defendants. | Case No. _____ |

## COMPLAINT

COMES NOW The Preserve at Metrocenter GP, LLC ("**Plaintiff**" or "**General Partner**") by and through its undersigned attorneys, and for its Complaint against Alliant Credit Facility, Ltd. (the "**Investor Limited Partner**") and Alliant Credit Facility ALP, LLC (the "**Administrative Limited Partner**," and collectively with the Investor Limited Partner, the "**Defendants**" or "**Limited Partners**") states and alleges as follows:

### PRELIMINARY STATEMENT

This action seeks, among other things, a declaration of the rights and obligations of the parties under the Amended and Restated Agreement of Limited Partnership (the "**Partnership Agreement**") governing The Preserve at Metrocenter, L.P. (the "**Partnership**"). The Partnership is a Tennessee limited partnership that owns and operates The Preserve at Metrocenter, a multi-family affordable housing complex located in Nashville, Tennessee (the "**Project**"), in accordance with the Low-Income Housing Tax Credit ("**LIHTC**") program.

1

In particular, the Limited Partners granted the General Partner an option to purchase the interests of the Limited Partners in the Partnership ("**LP Interests**") to allow the General Partner to continue to operate the Project as affordable housing, in accordance with LIHTC program requirements. However, the Limited Partners now refuse to convey their limited partner interests for the bargained-upon price, instead insisting upon a calculation wholly unsupported by the Partnership Agreement. This Complaint asks the Court to join the majority of courts nationwide that have, in response to this trend among LIHTC limited partner entities to capture unintended profits from affordable housing properties, held that the purchase price for the LP Interests is clearly and unambiguously stated in the Partnership Agreement, and is calculated based upon (1) a hypothetical sale of the Project and associated distributions in accordance with the Partnership Agreement, followed by (2) a hypothetical liquidation of the Partnership and related distributions.

## PARTIES

1. The Preserve at Metrocenter GP, LLC is a Tennessee limited liability company with its principal place of business located in Davidson County, Tennessee.

2. Alliant Credit Facility Ltd. is a Florida limited partnership with its principal place of business in Los Angeles County, California and may be served with process at 1205 Manatee Avenue West, Bradenton, Florida 34205, Attn: Curtis D. Hamlin, Esq., Porges, Hamlin, Knowles & Hawk, P.A.

3. Alliant Credit Facility ALP, LLC is a Florida limited liability company with its principal place of business in Los Angeles County, California and may be served with process at 1205 Manatee Avenue West, Bradenton, Florida 34205, Attn: Curtis D. Hamlin, Esq., Porges, Hamlin, Knowles & Hawk, P.A.

## JURISDICTION, VENUE, AND CHOICE OF LAW

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between all Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000 for the Plaintiff.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as the acts and omissions giving rise to this claim occurred in Davidson County, Tennessee, and the Project is located in Davidson County, Tennessee.

6. This Court may exercise personal jurisdiction over the Defendants because, among other reasons, Defendants manage the Limited Partners' interests in the Partnership—the sole purpose of which is to own and manage the Project, which is located in Davidson County, Tennessee. Further, Defendants have entered into contracts based on Tennessee law regarding Tennessee property and affecting Tennessee residents, regularly communicates with Plaintiff in Tennessee, and has caused harm to a Tennessee organization in Tennessee.

7. The Partnership Agreement and the First Amendment, as described herein, both provide that they shall be governed by and construed in accordance with the laws of the State of Tennessee.

## FACTUAL BACKGROUND

### I. The Low-Income Housing Tax Credit (LIHTC) Program

8. The LIHTC program was created by the Tax Reform Act of 1986 to issue tax credits (the "**Tax Credits**") for the acquisition, rehabilitation, or new construction of multifamily rental housing for low-income households. In particular, the purpose of the LIHTC program is to leverage private-sector equity to develop affordable housing.

9. The LIHTC program is governed by Section 42 of the Internal Revenue Code (26 U.S.C. § 42 or "**Section 42**"), certain Treasury Regulations, guidance from the United States

Department of Treasury and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated state housing agencies in each state—in Tennessee, the relevant state housing agency is the Tennessee Housing Development Agency ("THDA") (collectively, the "**Tax Credit Rules**").

### A. *A Project Sponsor and Investor form a Limited Partnership*

10. Generally, in a housing development funded with Tax Credits (a "project"), the project owner is organized as a limited partnership or limited liability partnership (the "owner entity"—here, the Partnership), in which a "project sponsor" (which may be a for-profit developer—here, the General Partner—or non-profit organization) acts as the general partner or managing member of the owner entity.

11. The project sponsor procures an award of Tax Credits on behalf of the owner entity by engaging in a very competitive application process with the state housing agency—here, THDA.

12. Once the Tax Credits are awarded, the owner entity becomes entitled to an allocation of those Tax Credits over the ten-year period following the project being "placed in service," known as the "**Credit Period**." However, to be entitled to retain those Tax Credits the owner entity must comply with applicable federal rent restrictions for a concurrently running fifteen-year period, known as the "**Compliance Period**." Moreover, owner entities must also comply with rent restrictions for an additional fifteen-year period after the end of the Compliance Period, known as the "**Extended Use Period**."

13. Once the Tax Credits have been procured, the project sponsor, through a carefully negotiated agreement, admits a third-party investor into the ownership entity as a limited partner or an investor member (the "investor"—here, the Investor Limited Partner) subject to many

important conditions, rights, and obligations. The investor is admitted into this newly constituted partnership based on its agreement to contribute capital to the owner entity in exchange for the allocation of substantially all the Tax Credits available to the owner entity, along with certain other expected tax benefits—most notably, income losses and property depreciation deductions. This capital contribution is the primary funding for construction of the project.

14. The Tax Credits provide the investor with a generous dollar-for-dollar offset on income taxes for every dollar invested, in addition to significant deductions related to depreciation, allowing investors with large, predictable annual tax liability to substantially reduce their income taxes.

15. Because tax benefits (*i.e.*, Tax Credits and tax losses) flow to partners or members in accordance with the percentage of their ownership interests, and because the "purchase" of substantially all such tax-related benefits is the investor's bargain, the tax investor is virtually always given 99 percent or more of the federal and state tax items realized by the owner entity. However, the investor assumes only a passive role with respect to the operations and management of the owner entity and its property. This project sponsor bears the financial risk through various guaranties provide by its affiliates, and is responsible for development, construction, and management of the project.

        **B.**     *The Investor Grants the Project Sponsor a Buyout Option to Effectuate the Investor's Exit Following the Compliance Period*

16. By the end of the Compliance Period, the owner entity has allocated all Tax Credits, as well as other desired tax benefits, to the investor. At this time, investors seek to exit the partnership.

17. The investor often agrees to grant the project sponsor a buyout option to effectuate its desire to exit the partnership near or following the end of the Compliance Period (the "**Option**

5

Case 3:23-cv-00083     Document 1     Filed 01/27/23     Page 5 of 18 PageID #: 5

**Period**"). The buyout option typically allows the project sponsor to acquire either the project or the investor's limited partnership interests in the owner entity.

18. The ability to own all ownership interests in the project through the buyout option is one of the primary economic incentives for the project sponsor in a low-income housing project. This was the case here.

## II. The Partnership Agreement and the Partners

19. The Partnership is a Tennessee limited partnership that was formed for the sole purpose of acquiring, constructing, developing, owning, and operating the Project.

20. The Project is located in Nashville, Davidson County, Tennessee, and provides 80 units of affordable housing for low-income residents.

21. The Plaintiff is the project sponsor of the Project and facilitated the formation of the Partnership, acquisition and development of the Project, and application for the Tax Credits.

22. The Defendants are the investors in the Project.

23. On May 3, 2006, the Plaintiff, as General Partner, and the Defendants, as the Investor Limited Partner and Administrative Limited Partner, entered into the Partnership Agreement to govern the Partnership. A true and correct copy of the Partnership Agreement is attached here as **Exhibit A.**

24. On June 29, 2006, the Parties executed the First Amendment to the Partnership Agreement (the "**First Amendment**"). A true and correct copy of the First Amendment is attached hereto as **Exhibit B**.

### A. *The Limited Partners' Capital Contribution to the Partnership is Calculated Based Upon the Amount of LIHTC Tax Credits Awarded*

25. Consistent with the well-settled structure and intent of a LIHTC partnership, the Partnership Agreement reflects that the Investor Limited Partner made its capital contributions

specifically in exchange for 99.99% of the projected Tax Credits and depreciation. *See* Exhibit A at 14 (defining "Housing Tax Credits" as "any federal low income housing tax credits under Section 42 of the Code."); *Id*. at 20 (defining "Projected Housing Credits" as "the Housing Tax Credits . . . which the General Partners have projected to be the total amount of the Housing Tax Credits which will be allocated to the Limited Partners by the Partnership, constituting 99.99% of the Housing Tax Credits which are projected to be available to the Partnership," for a total of $7,549,640.00); *Id.* at § 9.1(A)(i) (allocating taxable income and losses other than from a sale or refinancing transaction for any taxable year to be 99.98% to the Investor Limited Partner, 0.01% to the Administrative Limited Partner, and 0.01% to the General Partner) and § 9.1(G)(i) (providing that tax allocations are allocated among the partners in the same proportions as profits and losses).

26. Upon information and belief, the amount of the capital contribution made by the Investor Limited Partner upon its admission into the Partnership was based and calculated upon the anticipated tax benefits to be received by the Investor Limited Partner rather than in consideration of any residual value that may accrue or appreciate over time in the Project owned by the Partnership.

27. The Partnership Agreement provides that if the Investor Limited Partner received less in Tax Credits than projected, these capital contributions would be decreased accordingly. *See* Exhibit A at § 3.8.

28. The Partnership Agreement further provides that if the General Partner failed to satisfy the conditions necessary to receive the Tax Credits in the event of a Tax Credit Shortfall, the General Partner would be forced to either (1) make a Capital Contribution in the amount owed

7

to the Investor Limited Partner or (2) pay the Investor Limited Partner directly the amount owed due to the Tax Credit Shortfall. *See* Exhibit A at § 3.8(C).

29. Further, consistent with the typical bargained-for exchange in a LIHTC partnership, individual affiliates of the General Partner guaranteed the completion of construction, the attainment of rental achievement, and the funding of operating deficits—all of which are crucial to securing the Tax Credits. *See* Guaranty Agreement, Exhibit A at E-1.

30. The Limited Partners expressly agreed that they would *not* be entitled to withdraw or demand a return of capital contributions. *See* Exhibit A at § 3.6.

31. Furthermore, in accordance with LIHTC industry standards, the Limited Partners expressly agreed that the General Partner will receive a distribution of 89.99% of the Cash Flow generated by the Project's operations following the payment of various Partnership obligations (*see* Exhibit A at § 9.2 (A)) *and*, pursuant to the Partnership Agreement's "Sale or Refinancing Transaction Proceeds" waterfall provision, 89.99% of the cash receipts available following any refinancing or sale of the assets of the Partnership. (Partnership Agreement at § 9.2 (B); *Id*. at 2 (defining "Sale or Refinancing Transaction Proceeds").

### B. The Limited Partners Grant the General Partner a Buyout Option in the Form of a Purchase Option of the LP Interests for a Negotiated Price

32. The Partnership Agreement contains a standard buyout option provision, allowing the General Partner to acquire the LP Interests following the expiration of the Compliance period:

> The purchase price for the Limited Partners' Interest pursuant to such option shall be the amount which the Administrative Limited Partner and Investor Limited Partner would have received (giving effect to reasonable estimates of closing costs which would have been incurred) in liquidation of the Partnership had a sale of the Apartment Complex been consummated at a price equal to the fair market value thereof (as determined in accordance with Section 5.4E hereinbelow).

*See* Exhibit A at § 5.4(C).

33. Therefore, the purchase price of the LP Interests is set based upon the hypothetical events of (i) first, a sale of the property and associated distribution of sales proceeds, and (ii) second, the subsequent liquidation of the partnership.

34. Section 5.4(E) of the Partnership Agreement allows for the parties to resolve disagreements regarding the fair market value amount determined by an appraisal. However, upon both parties' acceptance of an appraisal, the purchase price for the LP Interests is determined by the contractually-required formula.

35. Distribution and application of "sale or refinancing proceeds" is governed by Section 9.2(B) of the Partnership Agreement, which sets forth a "waterfall" in which the proceeds should be applied. Following the payment of all Partnership costs, the final provision of 9.2(B) contains a split of proceeds: "The balance, if any, 10% to the Investor Limited Partner, 0.01% to the Administrative Limited Partner and 90% to the General Partners . . . ." Exhibit A at § 9.2(B) (as amended by Exhibit B at § 7).

36. Section 12.4 of the Partnership Agreement, by contrast, only applies to "liquidate the assets of the Partnership" following the dissolution of the Partnership. *Id*. at § 12.4A.

37. Upon information and belief, the Limited Partners never disclosed to the General Partner upon their admission into the Partnership that, upon its exit from the Partnership following the end of the Compliance Period, that it intended to force a liquidation or otherwise attempt a return of its capital contribution or its projected capital account balance.

38. The General Partner invested in and took on considerable risk from the Partnership and dutifully served as the General Partner with these understandings and expectations.

39. Upon information and belief, the Investor Limited Partner also invested in the Partnership with these understandings and expectations.

40. Upon information and belief, the Administrative Limited Partner also invested in the Partnership with these understandings and expectations.

41. Without the rights afforded to it through this buyout option, the General Partner would not have participated in the Partnership and would be deprived of a primary economic right that the parties had originally negotiated and agreed to upon the original limited partner's admission into the Partnership.

### III. The Dispute

42. The Compliance Period for this Project ended December 31, 2021.

43. The Option Period thus began on December 31, 2021, and was available for four (4) months following the end of the Compliance Period, through April 30, 2022. *See* Exhibit A at § 5.4(C).

#### A. *The General Partner Exercises the Purchase Option*

44. By letter dated April 27, 2022, the General Partner sent by overnight delivery to the Limited Partners its notice of exercise of its option to purchase the Limited Partner interests (the "**Exercise Notice Letter**"). A true and correct copy of the Exercise Notice Letter is attached hereto as **Exhibit C.**

45. The General Partner arranged for an appraisal of the Project to be conducted by Valbridge Property Advisors ("**Valbridge**") to determine what the sale price of the Project would be for purposes of calculating the purchase price for LP Interests.

46. On or about April 28, 2022, the General Partner provided to the Limited Partners the appraisal report conducted by Valbridge dated April 27, 2022, which provided a value for the Project of Five Million and no/100 dollars ($5,000,000) (the "**Appraisal**"). A true and correct copy of the Appraisal is attached hereto as **Exhibit D.**

47. On or about April 28, 2022, the Limited Partners accepted the Appraisal and value calculation contained therein.

**B.  *The Limited Partners Refuse to Convey the LP Interests for the Bargained-Upon Price***

48. Following the Limited Partners' acceptance of the Appraisal, on May 10, 2022, the General Partner provided the Limited Partners with a calculation of the purchase price of the LP Interests pursuant to the agreed upon guidance in the Partnership Agreement.

49. The General Partner calculated the purchase price for the LP Interests pursuant to Section 5.4(C) of the Partnership Agreement by determining the amount that the Limited Partners would have received upon a hypothetical sale of the Project consummated at a price equal to its fair market value and associated distribution of sales proceeds, and thereafter a hypothetical liquidation of the Partnership (the "**Option Price Calculation**").

50. The Option Price Calculation is therefore based upon, first, the sale and refinancing transaction proceeds waterfall provisions contained in Section 9.2(B) of the Partnership Agreement, and second, the distribution to partners with a positive capital account balance in the event of the liquidation of the Partnership, pursuant to Section 12.4(A) of the Partnership Agreement.

51. The Option Price Calculation results in a purchase price of the LP Interests of Seven Hundred Twenty Thousand Nine Hundred Sixty-Two and 00/100 dollars ($720,962.00) to the Investor Limited Partner and Two Hundred Sixty-Six and 00/100 dollars ($266.00) to the administrative Limited Partner.

52. However, the Limited Partners refused to accept the Option Price Calculation as the purchase price for the LP Interests.

53. On May 31, 2022, the Limited Partners sent the General Partner a competing calculation of the distribution owed to the Limited Partners for the purchase of the Limited Partner Interests, demanding Two Million Fifty-Seven Thousand One Hundred and Thirty-One and 00/100 dollars ($2,057,131.00) in distributions for the Investor Limited Partner and One Hundred Two and 00/100 dollars ($102.00) in distributions for Administrative Limited Partner.

54. The Limited Partners' calculation is based not upon the agreed upon language required by Section 5.4(C) of the Partnership Agreement, but assumes an event of dissolution of the Partnership (the "**Dissolution Calculation**"). A true and correct copy of the Dissolution Calculation is attached hereto as **Exhibit E.**

55. Both the Option Price Calculation and the Dissolution Calculation assume a Project value of $5,000,000, as provided in the Appraisal, and a loan payoff of approximately $2.09 million, though the loan payoff amount differs slightly. *See* Exhibits E and F.

56. However, while the Option Price Calculation follows the order of operations required by the purchase option provision of the Partnership Agreement (Section 5.4), the Dissolution Calculation is based upon an event of dissolution occurring *prior to* a distribution based upon a hypothetical sale of the Project, and therefore includes a repayment of the Investor Limited Partner's capital account pursuant to Section 12.4B. *See* Exhibit E.

57. On June 8, 2022, the General Partner sent by overnight delivery to the Limited Partners a letter containing the Option Price Calculation and demand to convey the Limited Partner Interests (the "**Demand Letter**"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit F**.

58. Despite the General Partner's timely exercise of its bargained-for purchase option and demand, the Limited Partners have failed to convey the LP Interests pursuant to the Option Price Calculation agreed upon in the Partnership Agreement.

## CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT
(Alliant Credit Facility, Ltd., and Alliant Credit Facility ALP, LLC)

59. The Preserve at Metrocenter GP, LLC fully incorporates the above paragraphs by reference as if fully stated herein.

60. The plain language of the Partnership Agreement establishes that the sale proceeds waterfall provision under Section 9.2(B) governs the determination of the amount Defendants would receive for LP Interests.

61. Defendants nevertheless assert in their Dissolution Calculation that that the sale proceeds provision of Section 9.2(B) must be disregarded and only the waterfall provision of Section 12.4, applying to the distribution of proceeds generated following the dissolution and liquidation of the Partnership, should be considered.

62. Defendants seek to apply Section 12.4 to the General Partner's purchase of the LP Interests because they believe this will entitle them to a distribution amount based on their capital account balances—a bookkeeping entry based upon contributions that were made to the Partnership pursuant to the Partnership Agreement to obtain the Tax Credits, *not* the residual value from the Project—and thus obtain significantly more than the 10% net proceeds the Limited Partners are entitled to pursuant to Sections 5.4(C) and 9.2(B) of the Partnership Agreement.

63. Contrary to both the legislative intent of the LIHTC program to facilitate the long-term provision of affordable housing and the parties' intentions, Defendants' interpretation of the Partnership Agreement would deprive the General Partner of the benefit of its bargain, including

its ability to acquire the LP Interests at the intended, agreed upon price, and thus continue to effectively operate the Project as much-needed affordable housing for low-income individuals in Nashville, Tennessee.

64. The Dissolution Calculation contravenes the Partnership Agreement, Section 42, the LIHTC Program, as well as the initial expectations and projections of the parties at the time of the initial tax credit investment and entry into the Partnership Agreement.

65. The Defendants' refusal to convey the LP Interests for the bargained-upon price and demand of an exorbitant payout has caused a direct and palpable injury to the Plaintiff.

66. Defendants have created an actual controversy as to the terms on which the General Partner is entitled to purchase the LP Interests—namely, whether the Option Price Calculation pursuant to Section 9.2B of the Partnership Agreement or the Dissolution Price Calculation which assumes a dissolution event pursuant to Section 12.4 of the Partnership Agreement is the correct method of calculating the purchase price of the LP Interests.

67. A declaratory judgment would resolve the uncertainty and controversy giving rise to these conflicting contentions. TENN. CODE ANN. § 29-14-103

## COUNT II: BREACH OF CONTRACT
(Alliant Credit Facility, Ltd., and Alliant Credit Facility ALP, LLC)

68. The Preserve at Metrocenter GP, LLC fully incorporates the above paragraphs by reference as if fully stated herein.

69. The Partnership Agreement is a valid and binding contract.

70. The General Partner has timely and properly exercised its Purchase Option, thereby creating a valid and binding option contract for the purchase of the LP Interests on the terms set forth in the Partnership Agreement.

71. The Partnership Agreement includes a clear, unambiguous formula for the calculation of the purchase price of the LP Interests. *See* Exhibit A at § 5.4(C).

72. Defendants have breached the Partnership Agreement by refusing to convey their LP Interests to the General Partner for the bargained-upon price determined in the Partnership Agreement.

73. Defendants' refusal to convey the LP Interests and repudiation of the governing provisions of the Partnership Agreement is directly and proximately causing the General Partner's damages, including, without limitation, lost opportunity costs.

74. The General Partner is entitled to, among other things, an order for specific performance requiring the Defendants sell and transfer the LP Interest to the General Partner for the amount Defendants would if the Option Price was distributed in accordance with Section 9.2(B) of the Partnership Agreement, and any remaining assets that would be liquidated following the Partnership's subsequent, hypothetical dissolution distributed in accordance with Section 12.4.

75. The General Partner is entitled to recover any damages it incurs due to Defendants' breaches of the Partnership Agreement, including any lost opportunity costs, and to recover attorney's fees and costs under Section 16.14 of the Partnership Agreement.

76. The difference between the Option Price Calculation—which The General Partner asserts is the proper, contractual price for the LP Interests—and the Dissolution Calculation—the ransom amount the Limited Partners now demand for the LP Interests—is One Million Three Hundred Thirty-Six Thousand Five and 00/100 dollars ($1,336,005.00). Therefore, the General Partner has suffered damages in excess of $75,000.

## COUNT III: BREACH OF OBLIGATION
## OF GOOD FAITH AND FAIR DEALING
### (Alliant Credit Facility, Ltd., and Alliant Credit Facility ALP, LLC)

77. The Preserve at Metrocenter GP, LLC fully incorporates the above paragraphs by reference as if fully stated herein.

78. The Partnership Agreement includes an implied covenant of good faith and fair dealing, requiring that Defendants, among other things, not do anything to impair the General Partner's rights to receive benefits under the Partnership Agreement or interfere with any obligations the General Partner may have.

79. Defendants' refusal to sell the LP Interests for anything other than its capital account balance is also a breach of this duty of good faith and fair dealing because it is an attempt to negate Section 9.2(B) and allow Defendants to take for themselves the General Partner's intended bargain under the Partnership Agreement to the detriment of the General Partner (as well as the Partnership, the Project, and its tenants).

80. Defendants' actions contravene the parties' intentions, the Partnership Agreement, and the LIHTC program, and are not commercially reasonable in the context of the LIHTC industry.

81. Defendants' demand of the Dissolution Calculation is not a reasonable interpretation of the requirements of the Partnership Agreement.

82. The General Partner is entitled to recover any damages it incurs due to Defendants' breaches of the implied covenant of good faith and fair dealing.

# PRAYER FOR RELIEF

WHEREFORE, The Preserve at Metrocenter GP, LLC respectfully prays for the following relief:

1. That the Court issue a declaration that:

    a. The Preserve at Metrocenter GP, LLC has properly exercised its Purchase Option;

    b. Section 5.4(C) of the Partnership Agreement determines that Section 9.2(B) governs the distribution of the proceeds from the hypothetical sale of the Project at the Option Price Calculation and that Section 12.4 applies only to any remaining assets that would be liquidated following the Partnership's subsequent, hypothetical dissolution; and

    c. Defendants must sell and transfer the LP Interests to The Preserve at Metrocenter GP, LLC for the amounts Defendants would receive if the Option Price was distributed in accordance with Section 9.2(B) of the Partnership Agreement, and any remaining assets that would be liquidated following the Partnership's subsequent, hypothetical dissolution in accordance with Section 12.4.

2. That the Court order specific performance requiring Defendants to sell and transfer the LP Interests to The Preserve at Metrocenter GP, LLC on the terms set forth above; and

3. That the Court order such other and further relief, including, without limitation, monetary damages and attorney's fees and costs, which the Court may deem just, equitable, and appropriate.

Dated: January 27, 2023

Respectfully submitted,

*/s/ Emma B. Elliott, Esq.*
Emma B. Elliott (BPR# 035994)
Jill Novak Dalrymple (BPR# 038801)
RENO & CAVANAUGH, PLLC
424 Church Street, Suite 2910
Nashville, TN 37219
Phone: (629) 255-0206
Facsimile: (202) 349-2471
Email: eelliott@renocavanaugh.com
jdalrymple@renocavanaugh.com

*ATTORNEYS FOR THE PRESERVE AT METROCENTER GP, LLC*